**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS L. ROBINSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:09CV 12 SNLJ(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Thomas L. Robinson for Disability Insurance Benefits under Title II of

the Social Security Act. The cause was referred to the undersigned United States Magistrate

Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a

Brief in Support of the Complaint. (Document Number 13). Defendant has filed a Brief in

Support of the Answer. (Doc. No. 17).

**Procedural History**

On November 21, 2006, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on June 15, 2003.[1] (Tr. 98-105). This claim was

_____

[1]Plaintiff filed a prior application for benefits on May 26, 2005, which was initially denied
and denied by an ALJ on October 27, 2006. (Tr. 35-41). The ALJ in this matter found that there
were no grounds to re-open plaintiff's prior application. (Tr. 53). As such, plaintiff's prior
application is not subject to judicial review. See 20 C.F.R. § 404.957(c)(1); Davis v. Sullivan,
977 F.2d 419, 420 (8th Cir. 1992).

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated October 1, 2008. (Tr. 62-66, 53-61). On December 4, 2008, the Appeals Council of the Social Security Administration (SSA) denied plaintiff's request for review. (Tr. 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.     ALJ Hearing

Plaintiff's administrative hearing was held by video on August 29, 2008. (Tr. 6). Plaintiff was present and was represented by counsel. (Id.). The ALJ began the hearing by admitting a number of exhibits into the record. (Tr. 7).

The ALJ then examined plaintiff, who testified that he was fifty-one years of age and attended eleven-and-a-half years of school. (Tr. 9). Plaintiff stated that he worked as an electrician in the past. (Id.). Plaintiff testified that he received training as an electrician in high school. (Id.). Plaintiff stated that he was six feet, two inches tall and weighed approximately 265 to 270 pounds. (Id.).

Plaintiff testified that he was not working at the time of the hearing. (Id.). Plaintiff stated that he last worked in 2002 for Conter Electric as an industrial and commercial electrician. (Tr. 10). Plaintiff testified that he worked for Conter Electric from 1991 until he was laid off in 2002. (Id.). Plaintiff stated that the company had a lay-off in 2002 and he was not the only employee laid off at that time. (Id.). Plaintiff testified that he was not experiencing any medical problems at the time he was laid off. (Tr. 11). Plaintiff stated that he was waiting to return to work when he experienced medical problems. (Id.).

Plaintiff testified that he was diagnosed with ITP,[2] a blood disease, at Southeast Missouri Hospital. (Id.). Plaintiff stated that he presented to Southeast Missouri Hospital with complaints of high blood pressure and testing revealed that he had ITP. (Tr. 14). Plaintiff pointed out that Georgia Gremillion, a nurse practitioner at Crosstrails Medical Center, stated in a letter that plaintiff suffers from ITP and that plaintiff should avoid any physical job that would put him in jeopardy for contusions. (Tr. 12). Plaintiff testified that the first doctor he saw for treatment of his ITP was Dr. Erin Lane. (Tr. 14). Plaintiff stated that Dr. Lane referred him to Dr. Morey Blinder in St. Louis, although he no longer sees Dr. Blinder due to lack of funds. (Id.).

Plaintiff stated that due to his ITP, he could bleed to death at any time if he sustains a cut or a fall. (Id.). Plaintiff explained that his blood does not clot sufficiently. (Tr. 15). Plaintiff testified that he must be careful to avoid cutting himself. (Id.). Plaintiff stated that his doctors have also advised him not to climb ladders and to avoid heights. (Id.).

Plaintiff testified that he was not taking any medication at the time of the hearing because he was unable to afford medication. (Id.). Plaintiff stated that when he was first diagnosed with ITP, he was prescribed steroids. (Id.). Plaintiff testified that the steroids were supposed to help build his blood cells. (Tr. 16). Plaintiff stated that the steroids were not effective, so his doctors discontinued the steroids in 2005. (Id.). Plaintiff testified that his spleen was removed in an effort to treat the ITP, but this did not result in any improvement. (Id.). Plaintiff stated that the only

---

[2]Idiopathic thrombocytopenia purpura (ITP) is a systemic illness characterized by extensive ecchymoses (a purplish patch caused by extravasation of blood into the skin), and hemorrhages from mucous membranes and very low platelet counts; resulting from platelet destruction by macrophages due to an antiplatelet factor; childhood cases are usually brief and rarely present with intracranial hemorrhages, but adult cases are often recurrent and have a high incidence of grave bleeding, especially intracranial. See Stedman's Medical Dictionary, 1606 (28th Ed. 2006).

remaining treatment option is experimental and he lacks the funds to receive this treatment. (Id.).

Plaintiff testified that he is married and that his wife works outside the home as a hotel manager. (Id.). Plaintiff stated that he tries to do very little at home. (Tr. 17). Plaintiff testified that, during a typical day, he moves around the house and eats a lot. (Id.). Plaintiff stated that he cooks, washes the dishes, and does small chores around the house. (Tr. 18). Plaintiff testified that he drives. (Id.). Plaintiff stated that he attends church on Sundays, and shops for groceries. (Id.).

Plaintiff testified that his children are grown. (Id.). Plaintiff stated that he does not visit with any relatives on a regular basis. (Id.). Plaintiff testified that one of his brothers is ill, his other brother lives in St. Louis, and he has a sister who lives in Saxon, Missouri. (Tr. 19). Plaintiff stated that none of his siblings have been tested for ITP. (Id.).

Plaintiff testified that he no longer has any interests. (Tr. 20). Plaintiff stated that his passion was working as an electrician and if he could return to work he would. (Id.).

Plaintiff's attorney then questioned plaintiff, who testified that when he worked for Conter Electric, he would commonly be laid off after finishing a job and then would be rehired when the company started a new project. (Tr. 21). Plaintiff stated that he stayed with the company for so long after being laid off in the hopes of being rehired when the company received a new contract. (Id.). Plaintiff testified that he was diagnosed with ITP after he was laid off. (Id.).

Plaintiff stated that, despite having a diagnosis of ITP, he feels "like a normal person." (Tr. 22). Plaintiff testified that he felt no different at the time of the hearing than he felt five years prior to the hearing. (Id.). Plaintiff stated that if he had not been told he had ITP, he never would have known he had the condition. (Id.). Plaintiff testified that he would be working if he did not

know he had ITP. (Id.). Plaintiff stated that he does not work because he fears that he will be injured on the job. (Id.).

Plaintiff testified that there is treatment for ITP but he lacks health insurance. (Tr. 23). Plaintiff stated that he does not receive regular Medicaid benefits but he is eligible for "Spend Down" benefits. (Id.). Plaintiff explained that he is required to spend $280.00 a month on healthcare expenses before he is eligible to receive any Medicaid benefits. (Id.). Plaintiff testified that he lacks the funds to spend this amount of money on a monthly basis so he does not receive Medicaid benefits. (Id.).

Plaintiff stated that Dr. Blinder terminated his services because plaintiff lacked health insurance and was unable to pay his medical bills. (Id.). Plaintiff testified that Dr. Blinder simply checked his blood platelet levels. (Tr. 24). Plaintiff stated that Dr. Blinder tried to get him into a "survey test." (Id.). Plaintiff testified that the group filled and he was unable to participate in the study, although he was still on a waiting list at the time of the hearing. (Tr. 25). Plaintiff stated that he would be nervous about performing an easier job due to the risk of being cut. (Id.). Plaintiff testified that he has to be cautious in everything he does, including driving. (Id.). Plaintiff stated that a cut could kill him, although he hopes that he could arrive at the hospital in time to prevent serious injury. (Tr. 26). Plaintiff testified that he believes that, as a result of his disease, he will not stop bleeding under normal circumstances if he sustains an injury. (Id.). Plaintiff stated that he was told to go to the emergency room if he sustains a cut and is unable to stop the bleeding. (Id.).

Plaintiff testified that he has experienced depression since being diagnosed with ITP. (Id.). Plaintiff stated that he is depressed because he is unable to work and support his wife and

grandchildren.  (Id.).

Plaintiff testified that he is unable to work due to his ITP and his mental condition.  (Tr.

27).  Plaintiff stated that, if he received disability benefits, he would be able to receive medical

treatment.  (Id.).  Plaintiff testified that if he received treatment and his condition improved, he

would like to return to work.  (Id.).

**B.      Relevant Medical Records**

The record reveals that plaintiff was admitted to Southeast Missouri Hospital on October 3,

2005, with a platelet count of 9,000.[3]  (Tr. 192).  Michael A. Kolda, M.D., indicated that plaintiff had

been admitted in May of 2005 with acute and chronic alcoholism, at which time he was found to have

macrocytosis[4] and thrombocytopenia.[5]  (Id.).  He stated that plaintiff was rehabilitated through the

Gibson Center, had not had a drink since May, and had been having his blood count monitored at

Crosstrails Clinic.  (Id.).  Plaintiff's platelet count had gone up to 30,000 but then drifted back down

slowly over time to 9,000.  (Id.).  Dr. Kolda stated that plaintiff had "no symptoms whatsoever."

(Id.).  Dr. Kolda diagnosed plaintiff with thrombocytopenia.  (Id.).  He stated that plaintiff was at risk

of spontaneous hemorrhage.  (Tr. 193).  Dr. Kolda recommended that plaintiff undergo a hematology

consult.  (Id.).

Plaintiff saw Erin H. Lang, M.D. for a hematology consult on October 4, 2005.  (Tr. 187-89).

_____

[3]In an adult, a normal platelet count is 130,000 to 400,000 platelets per microliter of
blood.  See Stedman's at APP 99.

[4]The occurrence of unusually large numbers of macrocytes in the circulating blood.  See
Stedman's at 1140.

[5]A condition in which an abnormally small number of platelets is present in the circulating
blood.  Stedman's at 1984.

Plaintiff had no excessive bleeding or bruising. (Tr. 188). A physical examination revealed no abnormalities. (Id.). Dr. Lang's impression was persistent chronic severe thrombocytopenia based on bone marrow findings, antibody for platelet on the liver spleen scan, most likely a form of ITP; and ex-alcoholism. (Id.). Dr. Lang recommended that plaintiff undergo a trial of IVIG[6] and start on a high dose of Prednisone[7] for maintenance to suppress immune systems and for long-term benefit until his ITP resolves. (Tr. 189).

Plaintiff presented to Georgia Gremillion, FNP, at Crosstrails Medical Center on October 10, 2005, with complaints of right hip pain and headaches. (Tr. 246-47). Ms. Gremillion's impression was ITP, low back/right hip pain, and hypertension. (Tr. 247). Ms. Gremillion continued plaintiff on Prednisone. (Id.).

Plaintiff presented to Ms. Gremillion on October 24, 2005, with complaints of thrombocytopenia and swelling in the feet. (Tr. 244-45). Ms. Gremillion sent plaintiff to the emergency room. (Tr. 245).

Plaintiff was admitted to Southeast Missouri Hospital on October 24, 2005, with a platelet count of 3,000. (Tr. 181-83). Plaintiff received IVIG and his platelet count went up to 20,000. (Tr. 181). Plaintiff was discharged on October 27, 2005. (Id.). He was prescribed Lisinopril,[8]

---

[6]Intravenous immunoglobulin (IVIG) is indicated for the maintenance treatment of patients with primary immunodeficiencies. See Physician's Desk Reference (PDR), 3418 (59th Ed. 2005).

[7]Prednisone is a corticosteroid drug that is indicated for patients with immunodeficiencies. See PDR at 966.

[8]Lisinopril is indicated for the treatment of hypertension. See PDR at 2124.

Lopressor,[9] and Prednisone. (Id.).

Plaintiff saw Dr. Lang for a consultation on October 25, 2005. (Tr. 179-80). Plaintiff denied spontaneous bleeding or bruising. (Tr. 179). Dr. Lang's impression was recurrent persistent severe thrombocytopenia, most likely ITP based on previous work-up but thrombocytopenia is Prednisone refractory and only responds to IVIG minimally in October of 2005. (Tr. 180). Dr. Lang recommended that plaintiff undergo another trial of IVIG. (Id.). She indicated that if IVIG is not effective, a splenectomy[10] would be a reasonable option for long-term control. (Id.).

On November 10, 2005, Joseph S. McCadams, M.D. performed a hand-assisted laparoscopic splenectomy. (Tr. 174-75). Plaintiff presented to Dr. McCadams on November 16, 2005, for a follow-up, at which time plaintiff was "doing great." (Tr. 200). Plaintiff's platelet count was above 100,000. (Id.). Plaintiff was instructed to refrain from any lifting maneuvers for eight weeks. (Id.).

Plaintiff presented to Southeast Missouri Hospital on December 5, 2005, with a platelet count of 7,000. (Tr. 172). The impression of Richard E. Draper, D.O., was thrombocytopenia. (Id.). Plaintiff was discharged with instructions to see Dr. Lang the next day for IVIG. (Tr. 173).

Plaintiff presented to Dr. Lang on December 12, 2005. (Tr. 206). Plaintiff had no bleeding. (Id.). Dr. Lang indicated that plaintiff had undergone IVIG on December 6, 2005, and December 7, 2005. (Id.). Dr. Lang's assessment was chronic ITP. (Id.). Dr. Lang noted that the splenectomy had failed. (Id.). Dr. Lang indicated that plaintiff needed immunosuppressant maintenance due to

---

[9]Lopressor is indicated for the treatment of hypertension. See PDR at 633.

[10]Removal of the spleen. Stedman's at 1810.

- 8 -

severe ITP. (Id.). Dr. Lang prescribed Imuran.[11] (Id.).

Plaintiff saw Ms. Gremillion on December 19, 2005, with complaints of low platelets and hypertension. (Tr. 240). Plaintiff's platelet count was 5,000. (Id.). Plaintiff had no other symptoms. (Id.). Ms. Gremillion indicated that she notified Dr. Lang of plaintiff's platelet count. (Tr. 241).

Plaintiff saw Ms. Gremillion on January 3, 2006, for a follow-up regarding low platelets, at which time plaintiff reported a drug-related skin rash. (Tr. 234-35).

Plaintiff presented to Dr. Lang on February 6, 2006, at which time plaintiff had no fever, excessive bleeding or bruising. (Tr. 205). Plaintiff had been taking Imuran since December 12, 2005, without response. (Id.). Dr. Lang discontinued the Imuran and referred plaintiff to a physician at Barnes for a consult. (Id.).

Plaintiff saw Ms. Gremillion on March 20, 2006, with complaints of hypertension. (Tr. 232-33). His blood pressure was 138/90. (Tr. 232). On April 24, 2006, plaintiff's blood pressure was 137/92. (Tr. 230). Plaintiff presented to Ms. Gremillion on May 15, 2006, for a follow-up regarding his hypertension. (Tr. 228-29). Ms. Gremillion found that plaintiff's hypertension was controlled. (Id.).

Plaintiff saw Joshua J. Field, M.D. and Philip Majerus, M.D. at Washington University School of Medicine Division of Hematology on May 25, 2005. (Tr. 216). Plaintiff denied difficulty with bleeding, petechiae[12] or easy bruising. (Id.). Plaintiff was on no therapy at that time. (Id.).

_____

[11]Imuran is an immunosuppressive antimetabolite indicated for the prevention of rejection in renal homotransplantation and for the treatment of rheumatoid arthritis. See PDR at 2966.

[12]Minute hemorrhagic spots, of pinpoint to pinhead size, in the skin, which are not blanched by pressure. Stedman's at 1468.

Plaintiff's platelet count was 17,000. (Id.). Plaintiff reported that he was unable to work due to concern about his bleeding risk. (Id.). The doctors noted that a recent study recommended not to treat patients who have a platelet count greater than 10,000 and who have no difficulty with bleeding. (Id.). They indicated that another treatment option would be a clinical study. (Id.). They stated that the best course of action may be simply to follow plaintiff and as long as he maintains platelet counts greater than 10,000 and has no difficulties with bleeding, not to intervene. (Id.).

Plaintiff presented to Dr. Field and Morey Blinder, M.D. on June 29, 2006, for a follow-up visit. (Tr. 214). Plaintiff reported no episodes of significant bleeding although he reported minor bleeding when he brushes his teeth. (Id.). Plaintiff denied petechiae or easy bruising as well. (Id.). Plaintiff's platelet count was 25,000. (Id.). Plaintiff indicated that he was very concerned about the possibility of bleeding and would favor being treated. (Id.). Plaintiff expressed interest in participating in a clinical trial that was expected to take place in the near future at Washington University. (Id.). The doctors indicated that they would let plaintiff know when the trial was available. (Id.).

Plaintiff presented to Drs. Field and Blinder on July 27, 2006, at which time plaintiff reported minor bleeding in the gums, but otherwise no difficulties. (Tr. 212). Plaintiff continued to be anxious about his platelet count, which was 20,000 at that time. (Id.). The doctors again noted expert recommendations that no treatment for patients like plaintiff with platelet counts greater than 10,000 and no evidence of bleeding was appropriate. (Id.). They indicted that plaintiff would be a good candidate for the clinical study. (Id.).

Plaintiff saw Ms. Gremillion for a follow-up regarding his hypertension on August 15, 2006, at which time Ms. Gremillion found that plaintiff's hypertension was controlled. (Tr. 227).

Plaintiff presented to Drs. Field and Blinder on August 24, 2006, at which time plaintiff reported no difficulty with bleeding or easy bruising, but continued to be anxious about his platelet count. (Tr. 210). Plaintiff's platelet count was 7,000 two weeks prior and was 15,000 at the time of his visit. (Id.). The doctors again noted that they were awaiting the start of the clinical trial and that treatment was not appropriate for patients like plaintiff. (Id.).

Plaintiff returned to Drs. Field and Blinder on October 19, 2006, at which time plaintiff reported minor bleeding in the gums but no difficulties with blood in the urine, blood in the stool, hemoptysis[13] or petechiae. (Tr. 208). Plaintiff's platelet count was 17,000. (Id.). The doctors stated that plaintiff did not require therapy. (Id.).

On November 15, 2006, Ms. Gremillion indicated that plaintiff's hypertension was controlled. (Tr. 224-25).

Plaintiff presented to Dr. Blinder and Catherine Rogers, RN, on November 16, 2006, for treatment of his ITP. (Tr. 308-09). They indicated that plaintiff had not responded to splenectomy or treatment with rituximab,[14] IVIG or Imuran. (Tr. 308). They stated that plaintiff's care had been complicated by his lack of insurance and that plaintiff had not been treated recently with any medication. (Id.). Plaintiff's platelet count had been hovering between 10,000 and 20,000. (Id.). Plaintiff reported only occasional gum bleeding and blood per rectum, although he admitted having difficulty with occasional constipation resulting in straining. (Id.). Plaintiff reported feeling well otherwise. (Id.). Dr. Blinder and Ms. Rogers indicated that they felt fairly comfortable with no

[13]Spitting of blood derived from the lungs or bronchial tubes, as a result of pulmonary or bronchial hemorrhage. Stedman's at 872.

[14]Rituximab is indicated for the treatment of patients with non-Hodgkin's lymphoma. See PDR at 958.

treatment as long as plaintiff maintained a platelet count of greater than 10,000 and had no evidence of bleeding. (Id.). They stated that plaintiff's rectal bleeding was likely associated with hemorrhoids and prescribed a stool softener. (Id.). They indicated that they would continue to wait for the clinical trial to open. (Id.).

Plaintiff presented to Dr. Blinder and Mark T. Schroeder, M.D. on January 4, 2007, at which time plaintiff reported no recent problems with bleeding, bruising, epistaxis,[15] melena,[16] or blood per rectum. (Tr. 305). Plaintiff felt well, was in good spirits, and retained a good functional capacity. (Id.). Plaintiff's platelet count was 23,000. (Id.). The doctors indicated that they would continue to wait for the opening of the clinical trial. (Id.).

Marsha Toll, Psy.D., completed a Psychiatric Review Technique on January 19, 2007. (Tr. 285-95). Dr. Toll expressed the opinion that plaintiff had no medically determinable impairment. (Id.).

Plaintiff saw Ms. Grimillion on February 15, 2007, for a follow-up regarding his hypertension. (Tr. 326-27). Plaintiff's blood pressure was 122/94. (Id.).

Plaintiff presented to Drs. Blinder and Schroeder on March 1, 2007, at which time he reported occasional bleeding gums but no other complaints. (Tr. 303). Plaintiff's energy level was good and he felt well. (Id.). The doctors discussed the clinical trial in detail with plaintiff and he indicated that he was very interested in participating. (Id.). Plaintiff was scheduled to return the following week for an initial screening. (Id.).

---

[15]Bleeding from the nose. Stedman's at 658.

[16]Passage of dark-colored, tarry stools, due to the presence of blood altered by the intestinal juices. Stedman's at 1176.

Plaintiff continued to follow-up with Ms. Gremillion for treatment of his hypertension from April 2007 through July 2008. (Tr. 311-14, 322-25, 339-40). Plaintiff appeared in no acute distress. (Id.).

In a letter dated July 31, 2008, Ms. Gremillion stated that she had been treating plaintiff since May 2006. (Tr. 345). Ms. Gremillion indicated that, due to plaintiff's ITP, a simple blow to the chest or head could result in internal bleeding. (Id.). Ms. Gremillion stated that because of his lack of insurance, plaintiff had not been afforded the opportunity to seek all available treatments for this condition, and he failed to respond to high dose steroid treatment and a splenectomy. (Id.). Ms. Gremillion admitted that, without the care of a qualified hematologist, it was difficult to assess plaintiff's ability to be employed. (Id.). Ms. Gremillion expressed the opinion that plaintiff should "certainly avoid any physical job that would put him at jeopardy for contusions." (Id.).

## C.    New Evidence Attached to Plaintiff's Brief

Plaintiff has attached a letter dated June 26, 2009 from Nancy Strothmann, Counselor, Missouri Department of Elementary and Secondary Education, Division of Vocational Rehabilitation ("Vocational Rehabilitation"). In this letter, Ms. Strothmann stated that Vocational Rehabilitation was placing his records in the inactive file because services did not seem appropriate at that time. Ms. Strothmann advised plaintiff to contact her at a later date when his situation improves.

Plaintiff has also attached a Client Evaluation Summary/Staffing from A.O., Inc. Employment Services, dated June 12, 2009. This report indicates that plaintiff expressed interests in the positions of Director of Religious Activities and Public Relations Specialist. The report concluded that plaintiff's desired vocational interests as Director of Religious Activities and Public Relations Specialist could not be recommended due to plaintiff's expressed health and safety concerns,

reported disability information, testing outcomes, career exploration, and labor market information. It was recommended that plaintiff pursue working toward obtaining a GED to build on his academic skill level, and become more marketable with employment opportunities.

## The ALJ's Determination

The ALJ made the following findings:

1.　　The claimant met the insured status requirements of the Social Security Act through March 31, 2007.

2.　　The claimant has not engaged in substantial gainful activity since June 15, 2003, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.　　The claimant has the following severe impairments: idiopathic thrombocytopenia purpura, hypertension, obesity, and a previous cervical fracture (20 CFR 404.1520(c)).

4.　　The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5.　　After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to frequently lift 25 pounds and lift up to a maximum of 50 pounds, stand or walk six hours out of an eight-hour work day, and sit six hours out of an eight-hour work day. He must avoid unprotected heights, hazardous moving machinery, and environments in which he may become cut.

6.　　The claimant is unable to perform any of his past relevant work (20 CFR 404.1565).

7.　　The claimant was born on July 24, 1957 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.　　The claimant has a limited, 11th grade, education and is able to communicate in English (20 CFR 404.1564).

9.　　The claimant is able to transfer job skills to other work within the residual functional capacity limitations expressed in finding number five.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2003 through the date of this decision (20 CFR 404.1520(g)).

12. The claimant is found not to be disabled. Therefore, an analysis of whether his substance abuse is material is not necessary.

(Tr. 55-61).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on November 21, 2006, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

(Tr. 61).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater,

87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B. The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one

of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.    Plaintiff's Claim

In his pro se brief, plaintiff argues that he is disabled due to his high platelet count.  The undersigned finds that the relevant issues in this case are as follows: (1) whether the ALJ properly determined plaintiff's residual functional capacity; (2) whether the evidence attached to

plaintiff's brief is new and material; and (3) whether the ALJ properly relied on the medical vocational guidelines to find plaintiff capable of performing jobs existing in significant numbers in the national economy.

As an initial matter, the undersigned notes that, in order to be entitled to a Period of Disability and Disability Insurance Benefits, a claimant must be insured for disability. See 20 C.F.R. §§ 404.315, 404.320. Thus, in order to receive disability insurance benefits, a claimant must show onset of disability before the expiration of insured status. See Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998). In this case, plaintiff must show an onset of disability prior to March 31, 2007, plaintiff's last date of insured status. As previously discussed, plaintiff's prior application for benefits is not subject to judicial review. Thus, the relevant time period for consideration of plaintiff's claim is from October 28, 2006, the date after the previous ALJ's decision, and March 31, 2007, the date plaintiff's insured status expired.

## 1. Residual Functional Capacity

In determining plaintiff's residual functional capacity, the ALJ first assessed the credibility of plaintiff's subjective complaints. "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ

"must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ properly pointed out Polaski factors and other inconsistencies in the record that detract from plaintiff's complaints of disabling ITP. (Tr. 56-60). The ALJ first stated that, despite plaintiff's diagnosis of ITP, he performs a substantial amount of daily activities, including driving, grocery shopping, doing light housework, reading, and watching television. (Tr. 56-57). In addition, plaintiff indicated in a Function Report that he takes care of pets, maintains his wife's car, washes his car, paints, and washes windows. (Tr. 151-55). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ properly concluded that plaintiff's ability to perform these activities was inconsistent with his claims of disability. (Id.).

The ALJ next noted that plaintiff testified that he stopped working due to a layoff rather than his allegedly disabling impairments. (Tr. 57, 10). In fact, plaintiff stated that he was not experiencing any medical problems at the time he was laid off. (Tr. 11). Despite not experiencing any medical problems, plaintiff did not work from the time he was laid off in 2002, until he was diagnosed with ITP in 2005. The fact that plaintiff did not stop working because of his allegedly disabling impairments undermines his credibility. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003).

The ALJ next discussed the objective medical evidence in detail and found that the objective medical evidence is not supportive of plaintiff's allegations of disability. (Tr. 57-60). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

During the relevant period, Ms. Gremillion indicated that plaintiff's hypertension was controlled. (Tr. 224-25). Plaintiff saw Dr. Blinder regularly during this period for management of his ITP. (Tr. 308-09, 305, 303). On November 16, 2006, Dr. Blinder noted that plaintiff's platelet count had ranged from 10,000 to 20,000. (Tr. 308). Plaintiff reported only occasional gum bleeding and blood per rectum due to constipation. (Id.). Plaintiff indicated that he felt well otherwise. (Id.). Dr. Blinder stated that he felt comfortable with no treatment as long as plaintiff maintained a platelet count greater than 10,000 and had no evidence of bleeding. (Id.). On January 4, 2007, plaintiff's platelet count was 23,000, and he reported no problems with bleeding, bruising, epistaxis, melena, or blood per rectum. (Tr. 305). Plaintiff felt well, was in

good spirits, and retained a good functional capacity. (Id.). On March 1, 2007, plaintiff reported only occasional bleeding gums but no other complaints. (Tr. 303). Plaintiff's energy level was good and he felt well. (Id.).

The ALJ next discussed the opinion of Ms. Gremillion. (Tr. 59). In a letter dated July 31, 2008, Ms. Gremillion stated that she had been treating plaintiff since May 2006. (Tr. 345). Ms. Gremillion indicated that, due to plaintiff's ITP, a simple blow to the chest or head could result in internal bleeding. (Id.). Ms. Gremillion admitted that, without the care of a qualified hematologist, it was difficult to assess plaintiff's ability to be employed. (Id.). Ms. Gremillion expressed the opinion that plaintiff should "certainly avoid any physical job that would put him at jeopardy for contusions." (Id.).

The ALJ first properly noted that Ms. Gremillion is not an acceptable medical source. Under social security regulations, a nurse practitioner is not an "acceptable medical source," but is considered an "other" medical source of information that the ALJ must consider in determining the severity of a claimant's impairments and how it affects the claimant's ability to work. See 20 C.F.R. § 404.1513(a), (d). The ALJ then considered Ms. Gremillion's opinion and found that it lacked credibility. (Tr. 59). The ALJ noted that plaintiff can tolerate smaller-scale contusions without adverse repercussions, as evidenced by plaintiff's frequent bleeding gums and hemorrhoids. (Id.). The ALJ stated that larger-scale cuts present more of a danger for plaintiff. (Id.). The ALJ found that Ms. Gremillion's limitation of any physical job that would put him at jeopardy for contusions seems to exceed the limitations that have been historically tolerated by plaintiff. (Id.). The ALJ, however, noted that he had considered these limitations in determining plaintiff's residual functional capacity. (Id.).

After properly assessing plaintiff's credibility, the ALJ made the following determination regarding plaintiff's residual functional capacity:

> [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to frequently lift 25 pounds and lift up to a maximum of 50 pounds, stand or walk six hours out of an eight-hour work day, and sit six hours out of an eight-hour work day. He must avoid unprotected heights, hazardous moving machinery, and environments in which he may become cut.

(Tr. 56).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The undersigned finds that the residual functional capacity formulated by the ALJ is supported by substantial evidence. The ALJ's finding is supported by the objective medical evidence. During the relevant period, plaintiff's treating hematologist, Dr. Blinder, found that no treatment was necessary for plaintiff's ITP as plaintiff's platelet count remained over 10,000 and plaintiff had no difficulty with bleeding. (Tr. 308). Dr. Blinder noted that plaintiff felt well, was

in good spirits, and retained a "good functional capacity." (Tr. 305). Dr. Blinder did not impose any functional restrictions on plaintiff. The only restriction found in the record is the opinion of Ms. Gremillion that plaintiff should avoid any physical job that would put him at jeopardy for contusions. (Tr. 345). This limitation was considered by the ALJ and was incorporated into plaintiff's residual functional capacity.

The ALJ's finding regarding plaintiff's residual functional capacity is also supported by other evidence in the record, including plaintiff's own testimony. Plaintiff engaged in many daily activities, such as housework, working on cars and driving, which involve risk for potential cuts and bruises. (Tr. 18, 151-55). Plaintiff also admitted at the hearing that he felt like a "normal person," and would be working if he did not know he had ITP. (Tr. 22). Plaintiff testified that he is unable to work only because he fears that he will sustain an injury on the job. (Id.). The ALJ's finding that plaintiff must avoid unprotected heights, hazardous moving machinery, and environments in which he may become cut adequately accounts for the risk associated with sustaining contusions due to plaintiff's ITP. Plaintiff has not alleged any limitations resulting from any of his other impairments and the record does not support the presence of any other limitations. Thus, the undersigned finds that the ALJ's residual functional capacity determination is supported by substantial evidence in the record as a whole.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this issue.

## 2. **Evidence Attached to Plaintiff's Brief**

As discussed above, plaintiff has attached additional evidence to his Brief. "Section 405(g) generally precludes consideration on review of evidence outside the record before the

Commissioner during the administrative proceedings." Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997) (citation omitted). However, "[t]he district court may remand a case to have additional evidence taken 'but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" Hepp v. Astrue, 511 F.3d 798, 808 (8th Cir. 2008) (quoting 42 U.S.C. § 405(g)). New evidence is material where it is "'non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied.'" Id. (quoting Jones, 122 F.3d at 115). Further, "[g]ood cause does not exist when the claimant had the opportunity to obtain the new evidence before the administrative record closed but failed to do so without providing sufficient explanation." Id.

The evidence at issue consists of a letter from Vocational Rehabilitation dated June 26, 2009, and a Client Evaluation Summary/Staffing from A.O., Inc. Employment Services dated June 12, 2009. This evidence is undoubtedly new as it did not exist at the time of the ALJ or Appeals Council decisions. For this reason, plaintiff had good cause for his failure to incorporate the evidence into the record in the prior proceedings.

The undersigned finds, however, that the new evidence is not relevant or probative of plaintiff's allegedly disabling condition during the period at issue. First, the evidence is dated outside the expiration of plaintiff's insured status and there is no indication that it relates to the relevant time period. The evidence reveals that plaintiff expressed an interest in the positions of Director of Religious Activities and Public Relations Specialist and that these positions could not be recommended due to plaintiff's expressed health and safety concerns, reported disability information, testing outcomes, career exploration, and labor market information. Plaintiff's

ability to perform these two self-selected specific positions after the expiration of his insured status is not probative of plaintiff's allegedly disabling condition during the period at issue. As such, remand based on this new evidence is not appropriate.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this issue.

**3.** **Medical-Vocational Guidelines**

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999) (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics match those contained in grids and only if the claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability of jobs to people whose impairments are non-exertional, and who therefore cannot perform the full range of work contemplated within each table." Id. at 26. Accordingly, the Eighth Circuit requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational

expert." Id. "[W]here a claimant suffers from a non-exertional impairment which substantially limits his ability to perform gainful activity, the grid cannot take the place of expert vocational testimony." Id. (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)).  In a case involving a non-exertional impairment, an ALJ may rely on the grids "if the ALJ correctly finds that the non-exertional impairment did not significantly diminish the claimant's RFC to perform the full range of activities listed in the grids." King v. Astrue, 564 F.3d 978, 979 (8th Cir. 2009).

The ALJ found plaintiff had certain exertional limitations: he could not frequently lift more than 25 pounds or lift more than a maximum of 50 pounds, stand or walk longer than six hours out of an eight-hour work day, and sit longer than six hours out of an eight-hour work day.  The ALJ also found plaintiff had certain non-exertional limitations: he must avoid unprotected heights, hazardous moving machinery, and environments in which he may become cut.  Under King, if the ALJ correctly found plaintiff's non-exertional impairments did not diminish his ability to perform the full range of medium activity, there was no obligation to call a vocational expert.  King, 564 F.3d at 979.

To support his reliance on the grid rules, the ALJ stated as follows:

> The additional [non-exertional] limitations as set out in residual functional capacity finding number five do not preclude other work as an electronic assembler, office cleaner, cashier, packer, information clerk, security monitor.  A finding that the claimant is 'not disabled' is therefore appropriate under the framework of this rule.

(Tr. 61).

The undersigned finds that the ALJ committed error by not eliciting the testimony of a vocational expert.  The ALJ did not make a finding that plaintiff's non-exertional impairments do not significantly diminish plaintiff's residual functional capacity to perform the full range of activities listed in the Guidelines.  Rather, the ALJ found that plaintiff was not disabled because,

in the opinion of the ALJ, he was capable of performing six specific positions. The ALJ provided no support for this finding.

Plaintiff's environmental restrictions preclude him from performing whole categories of jobs-he cannot perform any job that requires him to be exposed to heights, dangerous machinery, or environments in which he may become cut. As such, plaintiff's non-exertional limitations significantly diminish plaintiff's residual functional capacity. The ALJ's finding that plaintiff was able to perform other work existing in significant numbers in the national economy in spite of his nonexertional impairments thus "invaded the province of the vocational expert" and was improper. Foreman, 122 F.3d at 26 (quoting Sanders v. Sullivan, 983 F.2d 822, 824 (8th Cir. 1992)).

Accordingly, the undersigned recommends that the decision of the Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict his ability to perform jobs in the national economy.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this __1st__ day of February, 2010.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE